## CALVIN B. NILES *v.* CENTRAL VERMONT RAILWAY COMPANY.

### November Term, 1913.

Present: POWERS, C. J., MUNSON, WATSON, HASELTON, and TAYLOR, JJ.

Opinion filed January 17, 1914.

*Commerce—Pleading—Replication—Departure—Waiver of That Defect—Master and Servant—Injuries to Servant—Rear-end Collision—Admission of Evidence—Contributory Negligence—Assumed Risk—Jury Question—Expert Witnesses—Qualification—Refusal of Instructions—Record.*

Since the Federal Employers' Liability Act is exclusive to the extent of its application, where the declaration in a railroad employee's action for personal injuries is at common law only, a replication alleging a cause of action under that Act is a departure.

Where the replication is a departure, and defendant's demurrer thereto on that ground was overruled, subject to his exception, which was "ordered to lie," by thereupon going to trial on the merits he waived that defect.

The objection of remoteness of offered evidence is addressed to the discretion of the trial court.

On the issue whether a rear-end collision of railroad trains was owing to the rear engine so leaking steam that its engineer could not see the signals set by the train ahead, evidence that five or six months before the collision the rear engine did not leak steam was admissible, as it tended to show that the claimed condition of the engine at the time of the collision was abnormal.

On the issue whether a rear-end collision of railroad trains was owing to the rear engine so leaking steam that its engineer could not see the train ahead, evidence of the condition of the rear engine in that regard during a former part of the same trip was clearly admissible.

It is so perfectly obvious that the condition of plaintiff, while riding back after a railroad wreck resulting in a bad compound fracture of both bones of his leg and other injuries, "was not one of great comfort" that any error in admitting evidence to that effect could not have harmed defendant.

One need not allege more than he is required to prove, nor prove what everybody knows, and so in a servant's action for negligence alleged to have resulted in breaking plaintiff's leg, it is not error to admit evidence that after having his leg broken he suffered pain, over the objection that there was nothing in the declaration warranting recovery for pain and suffering.

On review, an exceptor will be confined to the objections that he made below to the admission of evidence.

The court properly refused to allow counsel to elicit what a witness understood about a matter in respect of which he had testified that his only knowledge was hearsay.

Actual experience in a comparatively new and rather difficult surgical operation was not necessary to qualify an experienced and skilful surgeon to testify as to the effect of such operation.

To be available, a point made in support of an exception must be briefed by the exceptor.

On the issue whether defendant was abandoning the use of compound engines, an offer to show the record of a designated compound engine as compared with other engines of defendant, without saying whether these were simple or compound, was properly excluded.

In an action for injuries to a railroad brakeman from a rear-end collision, on the issue whether the rear engine was badly leaking steam on that trip, defendant's offered evidence that, if the engine was badly leaking steam on leaving a terminal, it was the duty of the engineer to report that fact to the master-mechanic, or to the superintendent of motive power, and have the engine repaired, was properly excluded on any theory, because the offer did not propose to show that the engineer did not in fact make such a report.

In an action by a railroad brakeman for injuries resulting from a following train colliding with his train, evidence that the rear engine leaked steam so badly that its engineer could not see the tail lights of plaintiff's train, which otherwise could have been seen a mile away, made the question of defendant's negligence one for the jury, and showed that such leakage of steam was the proximate cause of the accident.

In an action for injuries to a railroad brakeman by a rear-end collision that his evidence tended to show was caused by the rear engine leaking steam so badly that its engineer could not see the tail lights of plaintiff's train, evidence *held* not to show contributory

negligence, as matter of law, in that plaintiff failed to put out torpedoes and fusees.

Nor did plaintiff assume the extraordinary danger incident to the rear engine leaking steam so badly that its engineer could not see the tail lights of plaintiff's train.

Exceptions to the refusal of requested instructions that are not shown by the record will not be considered on review.

CASE for negligence. Declaration at common law, but manoeuvred into an action under the Federal Employers' Liability Act. Pleas, the general issue and a special plea in bar alleging facts showing the cause of action to be under the Federal Employers' Liability Act, and concluding with a verification. Replication to that plea, *precludi non,* because, etc., reciting and admitting the facts alleged in defendant's said special plea, and in addition more formally and at length, by way of a claimed "new assignment," averring all facts necessary to show that the cause of action is under the Federal Employers' Liability Act, concluding with a verification. *Similitur* and general denial constructively pleaded. Trial by jury at the March Term, 1913, Franklin County, *Miles,* J., presiding. Verdict and judgment for the plaintiff. The defendant excepted. The defendant seasonably filed a demurrer to the replication. Demurrer overruled, and replication adjudged sufficient, to which defendant excepted. Exception "ordered to lie," and thereupon the trial by jury was had.

*C. W. Witters, Harry B. Amey* and *C. S. Palmer* for the defendant.

*M. H. Alexander* for the plaintiff.

POWERS, C. J.   On the night of January 25, 1912, the defendant undertook to run three extras over its road from Essex Junction south. The one first to leave that station was No. 401, an interstate freight train, drawn by an engine of that number. The one next to leave was No. 416, a faster freight train, drawn by an engine of that number. The one last to leave was No. 52, an engine running light. These trains were operated under a combined order, which required them to run as three extras from Essex Junction to Montpelier Junction, meeting two north-

bound extras at Waterbury. This order was made complete for 401 at 10:54 P. M., but that train did not actually leave Essex Junction yard until 11:35 or 11:40. It was made complete for 416 at 11:50 P. M., but the train did not leave until about 12:35 A. M., January 26. It was made complete for 52 at 12:10 A. M., and this engine left some time after 416. After the order was made complete as to 401, and this train was thus authorized to leave as soon as it was ready to go, it drew down to the south part of the yard and took in some cars, did some shifting, and made up its train. This was done on various sidings, and when the work was completed, the train was switched onto a siding known as the "back track," to be out of the way of No. 6, the southbound sleeper, which was then so nearly due that 401 could not safely leave. When this had been done, the conductor, Brann, went back to the station to see if No. 6 was on time, and soon returned to his train with an order giving him two hours on the sleeper. Thereupon, 401 pulled out on to the main line and proceeded south. The night was clear, brightly moon-lit, and extremely cold. The train bore the usual tail lights. None of the stations which it passed were open, and there was no way to establish communication with the dispatcher. The plaintiff was the flagman of 401. It was his duty to comply with the requirements of the defendant's rules to protect his train from 416, which he knew was to follow. He rode in the van attached to the rear of his train and did nothing to protect it, except to get outside when the train passed a station and look back to see if 416 was in sight, until, at a point something over a mile south of Bolton station and when he thought the train would strike an up grade there and be thus slowed down, he dropped off a lighted fusee. This would burn red for five minutes and then yellow for five minutes, and by the rules would, while burning red, require a following train to stop until it was burned out; and while burning yellow, would require a following train to proceed with caution. 401 was a heavy train, but was making a fair run of it, and when the fusee was dropped was going about 15 miles an hour. It ran on a half a mile or more from where the fusee was dropped when 416, running from 20 to 25 miles an hour came crashing into it and caused the injuries for which the plaintiff sues. The collision occurred about two miles south of Bolton and at 12:35 A. M.

The engineer of 416 ran right over the burning fusee dropped by the plaintiff, but did not see it, because his engine leaked steam so badly that he could see nothing ahead of him. The accident happened on a long straight track of over two miles, and but for the leaking steam the engineer of 416 could have seen the tail lights of 401 for a long distance, which of itself would have given him ample time to bring his train under control.

Howard Bronson was flagman of 416 and was riding in the van of his train. When he felt the application of the air brakes, which was but an instant before the crash, with commendable promptness, we may say in passing, leaped from his train and ran back to stop 52. He seized the fusee dropped by the plaintiff, then burning yellow and dying down showing that it had been burning nearly ten minutes, and without difficulty, stopped the approaching engine. From the foregoing statement of facts, which the evidence fairly and reasonably tended to establish, it is apparent that this case is very similar to *Whites's Admrx.* v. *Central Vermont Ry Co.*, ante p. 330. Many of the questions here presented are identical with those disposed of in that case. There is no occasion to discuss these, and we pass them over without comment. The pleadings here differ from those in the White case in this respect, only: The declaration here is admittedly at common law. The exception to the overruling of the defendant's demurrer to the plaintiff's replication, was, in the case before us, ordered to lie. Since this declaration is at common law and since the remedy under the federal act is exclusive, *Mondon* v. *New York, N. H. & H. R. Co.*, 223 U. S. 1, 56 L. ed. 327, the plaintiff's replication was a typical departure. *Allen* v. *Tuscarora Valley R. Co.*, (Pa.) 78 Atl. 34; *Union Pacific Ry. Co.* v. *Wyler,* 158 U. S. 285, 39 L. ed. 983. But as is shown in the White case, advantage of this defect must be taken by demurrer or it is waived, and the fact that the defendant's exception was ordered to lie, makes no difference. *German* v. *Bennington & Rutland R. Co.*, 71 Vt. 70.

F. E. Bronson was the engineer of 401 at the time of the accident. He had run 416 five or six months before, and was allowed to testify that it did not then leak steam. It was objected that this evidence was too remote, and that it had no tendency to show the condition of the engine at the time of the accident. But the question of remoteness was, as usual, a ques-

tion for the trial court, *Belka* v. *Allen*, 82 Vt. 456, and, while the evidence did not tend to show the condition of the engine at the time in question, it did tend to show that that condition was abnormal, and so it was admissible.

E. R. Percival was the engineer of 52. From St. Albans to Essex Junction his engine had been coupled ahead of 416. Subject to exception, he was allowed to testify to the condition of 416 in respect of leaking steam during that run. This was objected to on the ground that it was too remote and had no tendency to prove the issue. But the condition of this engine in the respect named at the time of the collision was of vital consequence, and to establish this, evidence of its condition while on the way from St. Albans to Essex Junction was admissible. The other point of the objection is not briefed. This witness rode back to St. Albans that night on the train that carried the plaintiff there, and was in the van with him a part of the time. He was allowed to testify that the plaintiff's condition on the trip was "not one of great comfort." The defendant's objection to this was that there was nothing in the declaration entitling the plaintiff to recover for pain and suffering. It had appeared that the plaintiff had suffered a bad compound fracture of both bones of the leg, and other injuries, and the fact testified to was so perfectly obvious that the testimony could not have harmed the defendant. Moreover, one needn't allege more than he is required to prove; and he needn't prove what everybody knows; and since everybody knows that broken bones cause pain, evidence of that fact was admissible. *Bolton* v. *Ovitt*, 80 Vt. 362.

This witness was also allowed to testify that the headlight on 416, was, when he last saw it at Essex Junction that night, very badly smoked so that it "was just a red glow in the chimney." Various objections to this were made below, but none of these are among the reasons urged against it in the brief, so we pass them over. He also testified that he understood that the Grand Trunk was changing from compound to simple engines to save expense of repairs. Counsel for the defendant offered to show by him that he had no knowledge that such engines were being discarded by anyone, either on account of steam leaking or on account of expense in making repairs. This was excluded and the defendant excepted. The exception is without merit. The witness did not profess to know anything about it, but gave his understanding of the matter and the source thereof. Indeed,

counsel for the defendant asked him the direct question, ''Well, do you know anything about it, Mr. Percival?'' and he replied, in effect, that he did not, but that he had heard it.

Dr. E. J. Melville was a witness for the plaintiff and the court found him qualified to testify as an expert. He described a comparatively new operation, known as the Murphy operation, in which a piece of bone is taken from a patient's sound leg and used as a grafted splint on his injured leg, in cases like the plaintiff's. He was asked if the removal of such a piece of bone would impair the sound leg, and, when he answered in the affirmative, was asked to what extent it would impair it, and answered, subject to exception, to the extent of twenty per cent. The only objection then made or now urged is that Dr. Melville had never performed this operation, nor seen it performed, and consequently was not qualified to testify as an expert regarding the matter referred to in the question. But the finding of the court that Dr. Melville was qualified was abundantly sustained by the evidence of that question. For it appeared that he had had a long experience in surgery, under exceptionally advantageous circumstances, both in this country and abroad. Actual experience in the Murphy operation was not necessary to qualify him to answer the question objected to.

Subject to exception, the plaintiff introduced in evidence Example 3, on page 86 of the rule book. This was in connection with the cross-examination of the conductor of 416. The witness had been offered as an expert to testify to the meaning of certain rules, and his testimony on that subject was correctly rejected. *White's Admrx.* v. *Central Vermont Ry. Co., supra.* Before the example was offered, plaintiff's counsel asked the witness if 416 had any duty to perform in looking out for the train ahead; this was objected to on the ground that it amounted to a construction of the rules; and thereupon plaintiff's counsel offered the example and it was admitted over the objections of the defendant that it was allowing the witness to interpret the rule, and that it was out of time. These points are now waived; but it was further objected that the example was immaterial. However this may be, it will not avail the defendant, for the brief makes no point of it, but puts forward another ground of objection.

James E. Fitzsimons, who had acted as superintendent of motive power and master mechanic for the defendant, was called

as a witness for the defendant and asked, "How does the record of 416 compare with the record of your other engines that you have here?" This was excluded subject to exception. The objection to this question was not that the witness was not an expert, as the brief seems to treat it, but that the evidence was inadmissible. It is insisted that inasmuch as the plaintiff had attempted to show that compounds were being abandoned it was competent for the defendant to introduce evidence to show that this claim was untrue. And so it was, and the witness had already so testified. But the offer was something else. It was to show the record of 416 as compared with that of certain other engines. But whether those were simple or compound is not shown. Surely, it would have no tendency to refute the claim that compounds were being abandoned to compare the record of 416 with that of others of the same type.

The defendant also offered to show by this witness as an expert that it was the duty of the engineer of 416, if his engine was flooded with leaking steam, on leaving a terminal, to report the same to the office of the master mechanic or superintendent of motive power and have the engine repaired. This offer was finally put upon the ground that the fact that it was the engineer's duty to so report the condition of his engine would tend to refute the claim that the engine leaked steam badly on the way from St. Albans to Essex Junction, and thence on to the place of accident, as testified to by the plaintiff's witnesses. Assuming that the defendant's theory of this point was correct, the offer lacked one essential: It did not include a proposal to show that the engineer of 416 did not, in fact, make such a report to one or the other of the offices named. We cannot supply this omission, nor assume the fact so to be.

The argument of plaintiff's counsel to which exception was taken was wholly unwarranted and improper. The court so ruled, and instructed the jury to disregard it. Counsel for the plaintiff retracted it. The incident arose from an unfortunate misundersanding of the purport of the cross-examination of the plaintiff's medical witnesses, and counsel corrected himself as soon as his understanding was set right. It is apparent that no harm was done the defendant.

At the close of the evidence, the defendant moved for a verdict on various grounds, several of which merely renewed the points urged in support of the demurrer to plaintiff's replica-

tion.  These need not be noticed.  The ground most confidently presented in the brief is that upon all the evidence the plaintiff is not entitled to recover.  So much of the argument on this motion as is predicated upon the assumption that the action is at common law is disregarded.  As we have already seen, the federal statute supersedes the local law, and makes the remedy thereunder exclusive.  Though this action began as one at common law, it became one under the federal statute.  That there was evidence from which the jury could properly find negligence on the part of the company or its other servants seems too plain to require discussion; to suffer an engine leaking steam so badly as to render the eyes of the enginemen utterly useless so far as objects ahead of them are concerned is certainly enough to carry this question to the jury.  That this condition was a proximate cause of this accident is equally clear.  But for it the accident would not have happened.  For if his vision had not thus been obscured, Cushing, the engineer of 416, would have seen the tail lights of 401 a mile away, as Percival, the engineer of 52, did those of 416; he would have seen the burning fusee, and warned thereby, brought his train under control before the collision.  Much has been said about the plaintiff's duty to put out torpedoes and scatter fusees along from Essex Junction south, and rule 99 is relied upon by the defendant.  But this rule applies to a train which stops or is delayed on the main track.  401 neither stopped nor was delayed on the main line.  The switching at Essex Junction was on sidings, and there is no evidence that the main line was obstructed by the train.  Besides, the switching done, the train was set off and out of the way of main line trains and nothing in the rule under consideration longer applied to it, even if it had before.  See *Kiley* v. *Rutland R. Co.*, 80 Vt. 536.  There is nothing to indicate that this train stopped after it began to draw out on getting the allowance on No. 6 or that it was delayed anywhere on its trip south.  Still further, the law never requires one to do a perfectly useless thing.  If the plaintiff had scattered fusees along from Essex Junction yard as some of the defendant's witnesses said he should, and as often as every half-mile, all or possibly all but one would have burned out before 416 reached them.  Nor is there anything from which it can be inferred that the engineer of 416 would have seen those that would burn until he reached them.  The evidence is the other way, and it must be taken that

he would not have seen them. Nor does rule 36 to which the defendant refers help its case. This rule refers to a train which is not making the speed required by schedule or train order. 401 had no schedule and its order did not call for any particular speed. Likely enough, this rule would require such a train to make reasonable speed considering its class, and to act under the rule in case it did not. But it was making fifteen miles an hour, and this was said to be an average for that kind of a train. When the plaintiff thought his train would strike the upgrade and slow down, he threw off the fusee, which would have been a sufficient protection of his train had it not been for the faulty condition of the following engine.

Nor did the plaintiff assume the risk. He assumed the ordinary hazards of his occupation, and it may be admitted that these included the dangers ordinarily incident to operating one train behind another on the same track. But his assumption did not include extraordinary hazards—those existing through the negligence of his employer, unless he knew and comprehended them. He did not know of the condition of engine 416, and did not know that he was subjected to the increased dangers resulting therefrom. So such dangers were not assumed.

The defendant's brief refers to certain requests to charge which it says should have been granted. All that is shown by the bill of exceptions is that the defendant excepted "to the failure of the court to charge as requested in requests 1 to 7 inclusive." If we were to treat this exception as sufficient it would avail the defendant nothing, for the requests are not shown by the record, so they do not stand for consideration.

The defendant excepted to the action of the court in "submitting to the jury to find as a fact whether the trains were operated under standard rules at the time of the accident." A proper construction of the charge as given shows that this exception is without merit. It came from a misunderstanding of one expression, which, when read in connection with what follows and in the light of the whole course of the trial, did not amount to submitting that question. What the court intended to say, and what the jury must have understood it to say was that if they found that the standard rules were in general use by railroads throughout the country, and the defendant was complying with them at the time of the accident, it would tend to show that it was operating its train prudently.

The defendant also excepted to the charge regarding the requirements of rules 36 and 99, and to the action of the court in leaving it to the jury to say which of these rules applied.   We need not scrutinize the charge on this subject to see if it coincides with our view of the law in all respects; it is enough to say that if there is any error in it, it consists in giving the defendant more than it could rightfully ask.

*Affirmed.*