LAND FINANCE CORPORATION *v.* SHERWIN ELECTRIC CO.

February Term, 1929.

Present: WATSON, C. J., POWERS, SLACK, and MOULTON, JJ.

Opinion filed May 8, 1929.

*Max L. Powell* and *Guy M. Page* for the plaintiff.

*Charles F. Black* and *Robert W. Ready* for the defendant.

SLACK, J. This is an action of contract on two trade acceptances drawn by the Autocrat Sales & Distributing Corporation on the defendant, and accepted by it, payable to the order of the drawer, and indorsed by it to plaintiff before maturity. The defense now relied upon is fraud in procuring the acceptances. Trial was by jury, resulting in a verdict and judgment for the defendant.

On April 18, 1925, the defendant entered into a "Special Agency Agreement," in writing, with the Autocrat Sales & Distributing Corporation, hereafter called the Company, for the term of one year, and ordered from it seven dishwashing machines to be delivered at earliest convenience. The only description of the machines in the agreement is:

"2 Autocrat Dishwashing Machines Model 'B' (Com.)
 5 '' '' '' '' 'A' (Dom.)''

Under this agreement defendant was to furnish a list of names for mailing and advertising. The Company agreed to furnish free advertising and supplies, and "by special effort, to sell or cause to sell, goods listed above (the machines in question) within sixty days from arrival of shipment, or * * * * * * take back at prices shown thereon and in accordance with the period of this Agency Agreement any of such goods remaining unsold." At the bottom of the instrument was the following: "Only the written conditions appearing hereon in reference to this order are binding on the Company." The agreement is signed by the Company only by its salesman, J. M. McElroy. It contains no provision respecting the manner or terms of payment for the machines. The acceptances, of which there were three, were on separate pieces of paper. They were drawn and accepted at the time the agency agreement was executed and were payable 60, 90, and 120 days after date, respectively.

In compliance with its agreement, defendant sent the Company a mailing list April 23, 1925. Defendant received the machines May 22, uncrated one of them and displayed it in its show window, and started newspaper advertising. June 2, it wrote the Company asking for advertising matter and inquired when it expected to start its sales campaign. The Company replied the next day that it had sent the advertising matter

and that "within a week or so our demonstration and resales man will be with you to carry out our resales plan." Defendant never received the advertising matter nor did the Company send a salesman. The first acceptance was paid when due. Shortly thereafter, the date not appearing, defendant wired the Company: "Dishwashing machines arrived May 22 —You have cashed our trade acceptance without making any effort to sell the machines. Our bank will refuse further trade acceptances until you sell enough to cover acceptance used and next one due. We have done our part why not do yours." Defendant received no reply to this telegram, and June 24 wired the Company: "Courtesy of a reply to our telegram would be appreciated." The day following the Company wired that failure to reply to first telegram was an oversight, and wrote that delay in sending salesman was due to the fact that they were tied up elsewhere and that: "We confidently expect to have our man visit you and help you dispose of the machines on hand very soon." No one was sent, however. The second acceptance fell due July 17 and was protested. July 22, the day following the expiration of the time within which the Company agreed to sell or cause to sell the machines, defendant wrote the Company among other things as follows: "The sixty days in which you agreed to dispose of these machines has expired and you have not lived up to your contract in any way. * * * * We are not going to keep these machines in attempt to merchandise them ourselves. * * * * * In order to close this matter without further litigation we suggest that you return, to us, the amount of the first trade acceptance on receipt of which we will make immediate shipment of all machines." The next day the Company wrote defendant calling its attention to the fact that its agency agreement was for the term of one year, and added: "At the expiration of which time, any machines remaining unsold are subject to return in accordance with the terms of our agreement." It also wrote that it had learned that the second acceptance had been protested, and urged the importance of immediate payment. July 25 defendant wrote the Company that its information regarding the protest of the second acceptance was correct, and that it would so remain until the Company's long-promised salesman had disposed of a sufficient number of machines to take care of it and also the

78

acceptance which had been paid. This suit was commenced the latter part of the month following.

■ Subject to plaintiff's exception that its salesman, McElroy, had no authority to extend the limitation of the printed contract, that he could not by parol vary or enlarge the terms thereof, Mr. Sherwin, defendant's representative with whom the negotiations were had, was permitted to testify, in substance, that McElroy represented that the Company desired to establish an agency for the machines, and merely wanted to use defendant's place of business as headquarters in that locality; that defendant would not have to put any effort into the sale of the machines as plaintiff would send a corps of specially trained salesmen to sell them by new methods which were unknown to defendant; that plaintiff would furnish free certain advertising matter; that all machines not sold within sixty days plaintiff would take back for full credit, which would relieve defendant from any expense; that he showed witness very elaborate photographs of what appeared to be an excellent machine of very heavy gauge metal—14 gauge metal—Amco steel; that he told witness that the machines were very heavy white enameled—baked enamel, wrought iron legs and very heavy castors, that they were a flash switch machine so they could be operated by a one-fourth horse-power motor which was to be belted to a bronze shaft on which were welded or brazed a number of spoon-shaped discs; that the photographs displayed by McElroy showed the machines to be all that he claimed for them; that McElroy told him that he wanted the trade acceptances merely as evidence of defendant's good faith to the Company, and that, immediately upon receipt of notice that the machines had arrived, plaintiff would send its salesmen to dispose of them; that they would be sold so that none of the acceptances would ever be presented for payment, and that they would not be negotiated because there would be no need of so doing, and that said representations were false and fraudulent.

Since plaintiff treats all of this evidence as standing alike, we so treat it.

That McElroy was the Company's agent for the purpose of selling the machines in question cannot be doubted. Not only did it equip him with the necessary outfit to carry on such business, but it accepted the benefit of the business that he did. It held him out to the world as its accredited agent. That it

would be answerable for the fraud and deceit which the evidence in question tends to show he perpetrated on the defendant would be equally free from doubt were it not for the provision of the agency agreement last above quoted, since but for that he was clearly acting within the apparent scope of his employment in what he said and did. *Greenough* v. *United States Life Ins. Co.*, 96 Vt. 47, 117 Atl. 332; *Jones* v. *Sherwood Distilling Co.*, 150 Md. 24, 132 Atl. 278; Story's Agency, pars. 452, 453; 31 Cyc. 158; 2 C. J. 484. How does that provision affect the admissibility of this evidence under the defense here relied upon? This precise question has never been passed upon by this Court. In *Ætna Chemical Co.* v. *Spaulding & Kimball Co.*, 98 Vt. 51, 126 Atl. 582, and in *Pictorial League* v. *Nelson*, 69 Vt. 162, 37 Atl. 247, the only cases cited by plaintiff, it was held that a somewhat similar provision precluded the admission of oral evidence to show that the written contract did not embody all of the terms of the agreement. But in those cases the defense was not, as here, that the contract was induced by the fraud and deceit of the agent. While it is held in some cases, among which are *Colonial Development Corp.* v. *Bragdon,* 219 Mass. 170, 106 N. E. 633; *Cannon* v. *Burrell,* 193 Mass. 534, 79 N. E. 780; *Pease* v. *Fitzgerald,* 31 Cal. App. 727, 161 Pac. 506; and *Equitable Mfg. Co.* v. *Biggers,* 121 Ga. 381, 49 S. E. 271, that a provision in such a contract that the principal shall not be liable for representations or agreements, or for representations and inducements, of the agent not contained in the contract, will bar a showing of fraudulent representations made as an inducement even when the defense is fraud; it is held otherwise, and on more sound and logical reasoning, we think, in the following cases: *Stroman* v. *Atlas Refining Corp.*, 112 Neb. 187, 199 N. W. 26; *Menking* v. *Larson,* 112 Neb. 479, 199 N. W. 823; *Schuster* v. *North American Hotel Co.,* 106 Neb. 679, 184 N. W. 136; *Shepard* v. *Pabst,* 149 Wis. 35, 135 N. W. 158; *Landfried* v. *Milam* (Tex. Civ. App.), 214 S. W. 847; *Roseberry* v. *Hart-Parr Co.,* 145 Minn. 142, 176 N. W. 175; *Jones* v. *Minks,* 188 Ill. App. 45; *Jones* v. *Bankers' Trust Co.,* 239 Fed. 770. See *Land Finance Corporation* v. *Grafton Co. Elec. L. & P. Co.* (N. H.), 144 Atl. 485. Our conclusion, which is supported by the latter cases, is that the provision under consideration protects the plaintiff against any contractual obligations not contained in the agency agreement, but does not protect it

80

from the consequences of its agent's fraudulent representations concerning the subject-matter thereof made for the purpose of inducing the defendant to enter into such agreement. Our own cases cited above are not to the contrary. That the agent had implied authority to speak concerning the character of the machines, at least, is obvious from the agreement itself, since it contains no information respecting them other than that above quoted. It is self-evident that in order for the agent to sell the machines it was necessary for him to make representations respecting them, and no one understood this better than the principal. Having authorized the agent to speak, the Company is liable for his fraud and deceit if he spoke falsely, irrespective of the limitation as to its contractual liability. In Mechem's Outlines of Agency (3rd ed.), par. 555, it is said: ''If the agent is expressly authorized to make representations or give information, or if he is put into a position where that is a natural and ordinary attribute, or if he is authorized to do an act which naturally and ordinarily involves giving information, answering inquiries, or making representations as a basis for doing the act contemplated, the principal—although he may have contemplated and expected that only true and proper representations should be made—will be responsible for false and fraudulent ones made by the agent while he is so acting and with reference to the thing authorized. (It will be observed that what is here being considered is not representations made a term in or part of a contract, like a warranty, but false representations made to induce action or inaction.) The fact that the principal is innocent would be no defense.''

■ ■ ⋅ While some of the representations detailed by the witness would not constitute actionable fraud, evidence respecting them was admissible to characterize the transactions as a whole. When fraud is the issue, the evidence must necessarily take a rather wide range, and may embrace all the facts and circumstances which go to make up the transaction, disclose its true character, explain the acts of the parties, and throw light on their objects and intentions. *Niles* v. *Danforth,* 97 Vt. 88, 122 Atl. 498; *Downing* v. *Wimble,* 97 Vt. 390, 123 Atl. 433; *Harponola Co.* v. *Wilson,* 96 Vt. 427, 120 Atl. 895. The evidence covered by this exception was admissible for the purpose for which it was received.

Subject to plaintiff's objection that McElroy's agency had not been shown and that evidence relating to his dealings as such agent with other parties was incompetent and inadmissible, other persons were permitted to testify to having made like contracts with him, at about the same time, respecting which his representations and the subsequent attitude of the Company toward the transaction in all essential particulars were the same as in the instant case. This evidence was admissible, if McElroy's connection with these transactions was established, *McCasker & Mallow* v. *Enright*, 64 Vt. 488, 24 Atl. 249, 33 A. S. R. 938; *Bradley Fertilizer Co.* v. *Fuller*, 58 Vt. 315, 2 Atl. 162; *Eastman* v. *Premo*, 49 Vt. 355, 24 A. R. 142, and we think it was. The evidence at least tended to prove such connection and the most plaintiff was entitled to was to have the question submitted to the jury, which it did not ask to have done.

At the close of plaintiff's opening argument to the jury, defendant was allowed to amend its answer by adding, in effect, that the representations made by plaintiff through its agent to obtain the acceptances was part of a fraudulent scheme whereby plaintiff planned to defraud merchants doing business in this and nearby states and that the dealings with defendant were part of such fraudulent scheme. This was excepted to on the ground that the issue was thereby changed. When some of the evidence considered under the previous exception was offered it was claimed that it was not admissible under the answer as it then stood, but the defendant claimed that it had been granted leave to amend its answer, which was not denied, and the trial then proceeded without objection to the admission of the evidence on that ground. It is admitted that pleadings are ordinarily amendable in the discretion of the court, but it is claimed that here was an abuse of discretion. We think not, in the circumstances. While it is now said that plaintiff was thereby put to a ''distinct disadvantage,'' the record does not show it. The action of the court was in accord with the spirit of the statute, G. L. 1795, and is supported by *Niles* v. *Danforth, supra.*

When the defendant discovered the fraud, it had the right to rescind the contract and recover back what it had paid, or resist an action for the contract price, or stand on the contract and recover such damages as it suffered by the fraud, or

recoup them in an action brought against it on the contract. *Mallory* v. *Leach,* 35 Vt. 156, 168, 82 A. D. 625; *Kelly* v. *Pember,* 35 Vt. 183; *Childs* v. *Merrill,* 63 Vt. 463, 22 Atl. 626, 14 L. R. A. 264; *Bartlett & Fortney* v. *Bonazzi,* 91 Vt. 192, 99 Atl. 886. It elected to do the former, or attempted to, as appears by its letter of July 22, 1925.

At the close of all the evidence plaintiff moved for a directed verdict on the ground that the evidence did not tend to show a rescission on any ground on which defendant had a right to rescind; that its only complaint prior to the commencement of this suit related to the Company's failure to send its salesmen in accordance with its agreement, which did not constitute fraud, and that defendant's evidence was that it would not have permitted such salesmen to sell the machines, in its name, at the contract price had they attempted to do so. In support of its claim that there was no rescission, plaintiff relies upon Act No. 171, Laws of 1921, §§ 48, 49, and 69, subd. III, but it is not apparent how these provisions materially change the established law of sales.

If the only element of fraud in the transaction was the false representations respecting the character of the machines, the defendant acted too late, since it learned that the machines were not as represented when it received them. But such was not the case, and defendant was not bound to rescind until the full extent of the Company's fraud was known. The evidence fairly tended to show that the Company's promise to dispose of the machines within a certain time was part, and a most important part, of the fraudulent scheme evolved by it. This undertaking by it was well calculated, and doubtless intended, to cause inaction on the part of its customers respecting the fraudulent representations concerning the machines until too late to avail them. They might well take the position that since the Company was to sell the machines it was immaterial to them whether they fulfilled the representations or not. Since this was so, defendant was not required to rescind, or say anything about the character of the machines, until it became apparent that the Company did not intend to perform its agreement, which was the climax of the fraudulent scheme. In its letter last referred to, defendant called the Company's attention to the expiration of the time within which it agreed to sell the machines and charged it with not having lived up to its

contract in *any way,* and notified it that defendant was not going to keep the machines and ''merchandize'' them itself, and was ready to ship them immediately upon receipt of the amount of the acceptance which had been paid. This condition the defendant had the right to impose. Act No. 171, Laws 1921, § 69, subd. IV; *Levy* v. *Chonavitz* (Co. Ct.), 163 N. Y. S. 658; *Feinman* v. *Weil,* 105 Misc. Rep. 298, 173 N. Y. S. 11. This letter tends to show a timely rescission; and the Company's reply tends to show that it regarded such letter as an offer to rescind, and that it declined the offer. If the Company declined the offer, defendant was not required to return the machines. *Bombardier* v. *Goodrich,* 94 Vt. 208, 110 Atl. 11, 9 A. L. R. 1028; *Bailey* v. *Manley,* 77 Vt. 157, 59 Atl. 200; *Barrett* v. *Tyler,* 76 Vt. 108, 56 Atl. 534, but had the right to retain them as security for the repayment of such part of the price thereof as had been paid. Act No. 171, Laws 921, § 69, subd. IV.

We are not unmindful of the holding in *Girard* v. *Jerry,* 95 Vt. 129, 113 Atl. 533, and *Hunt* v. *Lewis,* 87 Vt. 528, 90 Atl. 578, Ann. Cas. 1916C, 170, that a promise, even though made with deceitful purpose and present intention not to fulfill it, does not constitute actionable fraud. But here the defense does not rest solely on an unfulfilled promise. The evidence fairly tends to show that the promise of the Company to sell the machines within a specfied time was but part, though a most effectual one, of the fraudulent scheme devised and put in practice by it for the purpose of defrauding the defendant and others. In this respect the case is not materially different from *Harponola Company* v. *Wilson, supra.*

The evidence of defendant was, in effect, that because of its reputation in the vicinity where it did business, and the inferiority of the machines, it would not have permitted the Company to sell them in defendant's name at the contract price. But this cannot avail the Company in the circumstances of this case, and especially since it had no knowledge of defendant's attitude in this respect. The rule relied upon by plaintiff that one who seeks damages from another for the latter's failure to perform his contract must be ready and willing on his part to perform is not applicable since the defense is not failure of the .Company to perform its contract, but that because of its fraud there was no. contract.

The plaintiff briefs certain exceptions to the failure of the court to charge as requested, but, since neither the record nor the files show what those requests were, these exceptions are not before us.

 The plaintiff excepted to the court's failure to give any instructions respecting the question of rescission. While this exception is pretty general, it is sufficient in view of the fact that the charge is entirely silent on that subject. Since the evidence made this question an essential issue, the failure of the court to charge concerning it was error, even in the absence of any request. *Stoddard Bros.* v. *Howard,* 101 Vt. 1, 139 Atl. 776.

*Reversed and remanded.*